**COLGATE–PALMOLIVE–PEET CO. et al.
v. LEVER BROS. CO.**

No. 5774.

Circuit Court of Appeals, Seventh Circuit.

April 8, 1937.

Rehearing Denied June 21, 1937.

·Marston Allen, Erastus S. Allen, and Frank F. Dinsmore, all of Cincinnati, Ohio, Louis Quarles, of Milwaukee, Wis., Mason Trowbridge, of Jersey City, N. J., and Arthur C. Denison and Newton D. Baker, both of Cleveland, Ohio, for.appellants.

C. B. Tinkham, of Hammond, Ind., Leroy C. Shonts, John B. Macauley, and Frank Parker Davis, all of Chicago, Ill., Ramsay Hoguet, of New York City, Floyd S. Davis, of Cambridge, Mass., and Geo. I. Haight, of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Appellants and appellee are competitors engaged in making and selling soap. Their activities cover the entire industry. The competition and the competitive methods which led to this litigation concern themselves with laundry soap. The size of this branch of the industry as conducted by the three parties to the litigation is tremendous.

Appellants assert that they jointly own the patent covering the product of the inventive mind which produced a better and more acceptable soap than was ever before offered to the housewife or the laundryman. They ask the court for the protection which this discovery deserves. Appellee denies all such claims of merit and distinction, disputes all its adversaries' asserted

right to patent protection, and denies infringement; hence, this controversy.

The patent granted to Dallas R. Lamont (and assigned to appellants) to reward one who made an original and unusually valuable contribution to the science of soap making, is asserted and assailed. The validity of the patent is denied; its infringement is disputed.

Many hundreds of thousand words have been spoken by witnesses who proclaimed their belief in the merit of Lamont's discovery. An equal number of witnesses assert that it would be a travesty on justice to honor Lamont with the name of inventor or to characterize what his coworker did, as invention.

The District Court held the patent was not infringed. On the issue of validity, he found not squarely, but invoked disputes over inferences when he used the following language:

"Lamont patent is invalid unless limited to a process of controlled steam inflation and the product thereof and as so limited is not infringed."

Validity and infringement of patent No. 1,652,900, issued December 13, 1927, to Dallas R. Lamont, are the subjects of our inquiry. The patent consisting of eleven claims covers both soap products and processes of manufacturing soap. The product is almost exclusively used for laundry purposes.

Lamont was an employee of the Industrial Spray Drying Company, which was entitled to his discoveries and inventions and to whom he duly assigned his patent. Through appropriate steps, the title and right to use the patent were transferred to appellants. Colgate-Palmolive-Peet Company, formerly Colgate & Company, obtained an exclusive license and started production in 1927 of a soap, called Super Suds. The appellant, Procter & Gamble, soon came out with a product known as Selox. The latter company was sued for infringement, and it purchased a half interest in the patent.

In 1929, appellee, a pioneer and always a very large manufacturer of soap for laundry purposes, brought out a laundry soap. It obtained patents which covered both the product and the process for making this soap. The extent and rapidity with which this so-called new laundry soap business grew is shown by the fact that in 1930, three years after the appearance of Super Suds, the public had used 500,000,000 cartons of the combined products of the parties. It may be fairly and conservatively said, speaking generally and not technically, that the soaps made by the parties to this litigation, for laundry purposes, are much alike. Admittedly they today dominate the field of granular washing soap.

Appellee called its laundry soap Rinso long before 1927. It never changed its name. Appellants assert that while the name remained the same, the product, and the process by which the soap was made, changed after appellants brought out their soap made in accordance with Lamont's patent teachings.

Colgate first called its soap made under the Lamont patent, Super Suds. It later brought out Palmolive Beads.

Procter & Gamble has given its laundry soap different names: Selox, Chipso, Chipso Granules, Oxydol, and Ivory Snow.

The application for Lamont's patent was made May 25, 1927, and it issued December 13, 1927. The specifications are extremely long and somewhat involved. There are eleven claims of which eight are contested. The first five are product claims. Three process claims, 7, 8, and 9, are also in issue. In the margin appear claim 2, a product claim, and claims 7 and 8, two process claims.[1] These claims are presented as typical. Appellee emphasizes claim 1, a product claim, and it is also reproduced in the margin.[1]

---

[1] Claim 1. "A spray processed soap product in which

(a) the component particles of the regular commercial run are of size readily perceptible to the naked eye,

(b) but are so small that the said product is inherently and necessarily a bulk soap product of such character that the said component particles are used in mass rather than as separate entities

(c) and are characteristically of a generally rounded globular shape,

(d) so that the product is free from substantial amounts of fine dust-like matter

(e) and presents to the eye the characteristic and distinguishing appearance of a large number of independently visible individually distinct little balls of soap as distinguished particularly from a powder

(f) substantially as illustrated and described,

(g) in which product the said component particles are capable of ready independ-

A brief statement of the history and the art of soap making, as well as a statement of what Lamont did, follows:

Commercial soap is ordinarily made by boiling soda lye and fats and oils in a kettle. When salt water is added to the mass, the kettle contents separate into layers of which the top one forms the basis for the ordinary soap of commerce. This material at kettle temperature is a molten mass and its composition is surprisingly constant at 70 per cent solids combined with 30 per cent water. At the temperature at which this soap is finished, i. e., between 170° and 212° F., the soap is a heavy molten mass and will flow in the mass, although it is not a liquid and is not free-flowing. In this condition the soap is called kettle soap, or more technically, neat soap. This condition is spoken of as the "neat soap" phase.

When neat soap is cooled to a temperature of 150° F. or below, it changes and becomes what is known as solid soap. Also if moisture is driven out of soap when in the neat soap phase, the transformation ent relative movement without clinging together

(h) which promotes ready separation of the said particles upon introduction of the product into water, and which component particles are capable of maintaining their independent identity during dissolving without tending to form into a lump, and

(i) are also substantially immediately accessible to the solvent action of the water,

(j) whereby notably rapid and complete solubility is assured

(k) and positive resistance to lumping and balling of the product not heretofore attained in soap products is effected."

Claim 2. "A spray processed soap product in which

(a) the component particles of the regular commercial run of the product are averagely hollow bodies

(b) of rounded generally ball-like shape

(c) sufficiently large to readily appear to the eye as independent individually distinct particles

(d) of reasonably uniform size and

(e) sufficiently small to constitute necessarily a bulk soap product of such character that the said component particles are used in mass rather than as separate entities, and

(f) consist of a shell of dry soap material solidified into the said characteristic rounded shape

(g) embodying substantially a single principal void, all substantially as illustrated and described, and

(h) in which product the average typical individual hollow component particles comprise appreciable amounts of soap

(i) so that the respective particles are individually distinct bodies capable of ready independent relative movement and ready separation upon introduction into water,

(j) are capable of attaining practically immediate contact with water upon being dropped upon the surface thereof and

(k) of maintaining their independent identity without sticking together to form masses of undissolved soap, and

(l) are large considering the amount of soap contained therein to thereby present an available surface area which is large relative to the amount of soap in the particle,

(m) whereby the said soap product is free from any substantial characterizing amount of powder or dust-like matter,

(n) is soluble with particular readiness, speed and completeness, and

(o) is characterized by a total absence of any tendency to form lumps, balls, or spots of undissolved soap in washing."

Claim 7. "The process of producing a soap product in characteristically rounded hollow generally globular particle form; substantially as illustrated and described, which comprises

(a) preparing a molten soap,

(b) maintaining the temperature of said molten soap sufficiently high so that it is reasonably fluid and can be reduced by spraying to reasonably finely divided condition without stretching and stringing of the soap material,

(c) spraying the said soap to thus reduce it to said reasonably finely divided condition,

(d) and converting the sprayed molten soap into particles having said rounded generally globular shape with voids within said respective particles and

(e) solidifying said particles into the said hollow rounded generally globular shape by bringing into contact with said sprayed molten soap a current of treating gas heated to a sufficiently high temperature and supplied in large quantity sufficient relative to the amount of soap being sprayed that the said conversion of the sprayed soap particles takes place without reduction of the temperature of the gas below the effective treating temperature before the particles assume a permanent form-retaining condition,

(f) whereby formation of said rounded generally globular hollow particles accom-

point from the neat phase to the solid phase takes place at higher and higher temperatures.

Appellants claim Lamont taught the art to spray this nonliquid material when in the neat phase, and during its transformation into the solid phase, to cause the soap substance itself to divide into particles which may be described as puffed or inflated.

If solid soap containing the percentage of water of neat soap is heated to a point above 150° F. (depending somewhat upon the particular fats used), the material is transformed into its neat soap or kettle soap phase, but once this phase has been reached, further rise in temperature can be continued without reducing the viscosity of the soap although in some instances its stringiness can be reduced at the higher temperatures. This quality of soap constitutes a sharp distinction between it and other kinds of heat fusible material, which as heat is increased become more fluid.

Appellants assert that the usual practice in spray processing of other materials required them to be first brought to a condition which formed fine round drops when sprayed which is impossible with neat soap. Neat soap is not film forming and will not break up into true drops when sprayed. It merely breaks into fragments.

Another phase in which soap can and does exist, is the "nigre" or soap solution phase. This phase, as in the instance of the neat phase, has a definite water content, and cannot exist with less than about 70 per cent of water. At a temperature around 170° F. and above, it is a true free-flowing thin liquid. When at lower temperature, about 150° F., and below, nigre does not change into solid soap but instead congeals into a wet-gelatinous, elastic-like material.

The nigre phase of soap is one in which the material can readily be sprayed, but when it is sprayed and dried by driving out moisture, it does not puff.

Intermediate between neat soap and nigre in respect of moisture content, is a substance known as "middle soap." Where water is present in soap in an amount less than about 70 per cent, and greater than about 30 per cent, middle soap exists. At kettle temperature it is a thick viscous gum, and further heating does not change its consistency. At no temperature can it be pumped or sprayed, and it can be stirred only with great difficulty. Below about 150° F. it congeals into an opaque, rubbery mass.

The existence of this middle soap phase is important in the present case because attempts to bring neat soap into a condition for spraying by thinning it with water are all but impossible. Soap solution can practicably only be made by dissolving small pieces of solid soap in a large amount of water, i. e., by adding soap to water and not water to soap. Thus soap is a substance which has to be made into a thin solution to bring it to readily sprayable condition, but this cannot ordinarily be done by the addition of water to neat soap.

Of the three phases of soap, neat soap, middle soap and nigre, the only one which is film forming and which will form round

panied and followed by removal and absorption of moisture from the said sprayed soap particles and consequent solidification of the particles into said rounded generally globular hollow shape is effected."

Claim 8. "The process of producing a reasonably finely divided soap in characteristically rounded hollow generally globular particle form; substantially as illustrated and described, which comprises

(a) preparing a molten soap containing the usual relatively high percentage of solids ordinarily attained in such molten soap as commonly manufactured,

(b) spraying said soap in finely divided condition and

(c) effecting formation of the said characteristically rounded hollow generally globular particles of soap and solidification thereof into permanent form-retaining condition by preheating the said soap so that at the time the said soap is sprayed it is at a temperature in excess of 200° F., and by

(d) bringing into contact with said current of molten soap a current of treating gas heated to a temperature of at least 300° F. when it first contacts with the sprayed particles of soap and supplied in large quantity sufficient relative to the amount of soap being sprayed that the said formation of the soap particles takes place without reduction of the temperature of the gas below its effective treating temperature before the said particles assume a permanent form-retaining condition,

(e) whereby formation of said rounded hollow generally globular soap particles and solidification thereof is effected."

drops upon being sprayed is nigre. The drop or rounded form is a valuable property in any spray process product and Lamont, although he sprayed neat soap and hence did not form round drops in his spray, yet by reason of his later puffing treatment converted the material into generally rounded particles, and moreover into particles of substantial size.

Soap also is heat sensitive and will burn at temperatures in the neighborhood of 385° F.

When sodium silicate is added or mixed in kettle soap, in a crutcher, as is ordinarily done, the neat or kettle soap remains in the "neat" condition although the water content may go as high as 40 per cent without reaching the middle soap phase. If the mix is treated with water there is a production of "middle soap" in the same manner as when water is added to kettle soap. There is no distinction therefore between kettle or "neat soap" in the pure state and with an appropriate amount of silicate of soda added. Both have the same phase characteristics.

The spray processing, with which the present patent is concerned in its process aspects, can be divided into two general classes in the prior art, spray cooling (where the sprayed particle becomes solid during its passage from the spray to the point of collection due to drop in temperature) and spray drying (in which moisture or other solvent is driven off from the sprayed particles leaving them at the final temperature of collection in a solid state for this reason).

Neat soap is a substance which recommends itself to spray cooling, because it changes to solid phase at a relatively high temperature. Only one commercial attempt to spray cool neat soap appears of record, and the substance was not particularly desirable because it was in large, jagged fragments, without puffing. Such a substance is not free flowing as it would be if in rounded particles. Such a product is not soluble in the manner of a puffed soap particle.

Neat soap when much of the moisture has been driven off burns quite readily.

Substances which had formerly been spray dried at high temperatures showed a tendency to glaze. Neat soap particles with a glaze upon them would resist ready solubility. Lamont found that neat soap would puff at high temperatures and not glaze.

A common practice in spray drying was to preconcentrate the material, such as milk, before spraying for purposes of economy. Neat soap could not be preconcentrated. Nigre soap cannot be preconcentrated because it will turn into middle soap, which cannot be pumped nor sprayed.

As a result of the peculiarities of neat soap, soap makers changed its nature by the addition of harsh chemicals prior to spraying.

They added soda ash to the product. The result of adding soda ash in sufficient quantities to neat soap is that it becomes in the hot state a composition of particles of matter floating in a liquid, a condition known as a "slurry." Slurries can be thinned by water, or if too thin, can be thickened by boiling. Hence spraying of soap-soda ash compositions did not present any conditioning problem preparatory to spraying.

A soap-soda ash composition solidifies quickly because the soda ash takes up water rapidly. Hence it is adapted to spray cooling. No heated drying air is required, and the final product will contain the same moisture content as the original slurry, in the usual practice.

Such a product is known on the market as washing powder, or by a term "soap powder." In the instant case it is necessary to distinguish between soap powder and powdered soap, the latter being the terms applied to soap when it is ground up from the solid state.

Soap powder or washing powder is a harsh, chemical detergent. Its action is drastic. It acts chemically in attacking dirt, whereas soap acts through suds, and tends to emulsify the dirt.

It was soap powder which constituted the commercial laundry soap product, which had been made and sold in large quantities by soap makers.

Attempts had been made in the art to spray dry soap, in contradistinction to spray cooling, although this was only experimental. The workers invariably reduced the neat soap to a nigre or soap solution before spraying, and what they made was a very fine powdery and dusty product, of glassy thin-walled particles. This product lumped and balled when stirred into warm water.

There had been flaked soap on the market, this being the most widely used form of soap dispensed in packages.

There had been powdered soaps on the market, and granular soaps in coarser form, these being solid soap reduced by mechanical grinding. The powdered soaps are dusty and lump and ball badly in warm water. The granular (larger sized chunks) do not possess any puffed quality, and naturally are not rounded in form and are slow to dissolve.

Neat soap, the soap phase with which Lamont dealt, is a material which appellants describe as *sui generis*. It cannot be water thinned, or heat plasticized beyond a certain point. It cannot be sprayed to form true drops. The substance can be spray cooled, but not to form a satisfactory product. The commercial package soaps prior to Lamont had been flaked soap, powdered soap, and granulated soap, all of these being made from soap which was first brought to solid form and then granulated.

The spray processed soap product which had been commercialized prior to Lamont, was not unadulterated soap, but was a soap-soda ash composition called soap powder or washing powder.

Lamont's Product. It may be fairly said that the Lamont patent deals with finely divided soap products, the material used being soap as distinguished from soap powder or washing soap in which soda ash predominates. Lamont uses molten soap taken from ordinary kettle soap. He claims his soap is more quickly and completely soluble than soap flakes, less fragile, so less likely to break up in the package. His product is distinguishable from granular or shredded soaps or soap powder in that it is less dusty and more soluble. For his product it is claimed that it is more uniform, flows more freely from carton, and does not lump when spread over water. The novel characteristics of his soap are set forth by counsel as follows:

"(a) rounded particle shape, not geometric spheres, but characteristically near spherical, potato shaped and reasonably smooth rounded formation * * * as distinguished from fragmentary, sharp cornered or shredded conformation; (b) particle size readily perceptible to the unaided eye, giving in the mass the appearance of independent balls with interstices visible between them."

Qualities (a) and (b) taken together give the product a free-flowing, non-caking, non-lumping, and dust free characteristic which are desirable and novel.

There is evidence to support these claims so stoutly asserted by appellants.

His process claims call for a structure with a tower. The soap is sprayed, etc., and the product passes out of the bottom. It is not contended that the apparatus is novel, but patentable novelty is asserted for the process by which the soap is treated.

We herewith set forth, greatly abbreviated, the substance of the inventor's own statement as it appears in the specifications. We have however eliminated, because of its great length, his description of the various steps in his process, including temperature statements.

"The * * * invention relates to the production of a soap product in reasonably fine state of division, * * * having certain useful novel physical properties and with a process of obtaining and controlling these physical properties in the product. The invention contemplates * * * a * * * soap as ordinarily produced by * * * commercial manufacture * * * which product * * * is * * * distinguished from so-called soap powders or washing powders which contain a predominating proportion of soda ash or similar ingredient. * * * The * * * invention is based on the discovery that a new product * * * can be produced * * * from molten soap of the usual composition and heavy flowing but not particularly viscid consistency ordinarily obtained in the manufacture of soap which is essentially different from products heretofore produced directly from such molten soap.

"Soap flakes, chips and the like, are not quickly and completely soluble in water of temperature convenient for washing. When the usual soap flakes are poured into water and stirred * * * they may be seen for some time * * * partly undissolved, and if not stirred until completely dissolved some part * * * collects at the bottom of the dish. * * * Undissolved soap frequently sticks to garments being washed and appears as a spot on the laundered article. Also, in washing machines, a considerable amount of the soap usually passes the washing machine undissolved. The most quickly * * * and most nearly * * * soluble soap flakes are those which are the thinnest, and * * * (such) are quite frail and * * * break up during man-

ufacture, shipment and use so that a considerable amount of dust forms. * * * Soaps in finely divided condition, granulated soaps, shredded soaps, soap powders, and the like are usually dusty and cause discomfort to the user. Such soaps tend to lump in water and remain partly undissolved. * * * (They) * * * cannot be poured * * * out of the package with * * * exactness as to amount. They frequently cake * * * in the carton and to be shaken out at all, require the removal of a substantial piece of the carton. The product of the present invention is uniform in particle size and is quickly and completely soluble; it is free-flowing and does not lump or cake in the carton or in water, and it is not dusty, * * * (which) qualities * * * give it a usefulness not heretofore obtained. * * * A description and definition of the product in terms of these qualities * * * (and) structural and * * * physical properties * * * which give it such qualities, and a * * * definition of the process by which such product is obtained constitute the subject matter of this application.

"The drawings * * * illustrate certain of the novel physical properties of the product and show an apparatus in which the process of the present invention can be successfully conducted. * * *

"The process of the present invention involves a spray treatment and drying of * * * soap material under certain particular controlled process conditions. * * * The apparatus consists basically of the principal drying or treating chamber 1. The molten soap is delivered into the tower 1 in the form of a spray by means of nozzles 2 located at appropriate intervals about the periphery of the upper end of the tower 1, as shown. The soap is delivered to the nozzles 2 through the soap line 3 which communicates with the soap mixing tanks or crutchers 4. The soap is withdrawn from the crutcher 4 by means of a suitable pump 5 and is forced through the heater 6 into line 3 and from thence to nozzles 2. The pump 5 maintains the soap in line 3 and at the nozzles 2 at a pressure appropriate for properly spraying the soap, as it issues from the nozzles, into uniform and reasonably finely divided condition. The heater 6 is preferably provided with a thermostatic control device 7 which controls admission of heating steam to the heater and thus regulates the temperature of the soap discharged from the

heater to a substantially constant proper value. The line 3 beyond the heater 6 is steam jacketed, and the steam supplied to the line is regulated by an automatic pressure controlling device 8 which functions to maintain the steam at a pressure which is equivalent to the condensation pressure for steam at a temperature equal to that of the soap as it leaves the heater 6. With this arrangement the temperature of the soap leaving the heater remains the same until the soap is delivered into the tower 1 through the nozzles 2, and a uniform temperature of the soap at all of the nozzles 2 is assured.

"The heated drying or treating gas is supplied to the tower 1 through duct 9 * * * which enters the top of the tower as shown. Inside of the tower under the discharge end of the duct 9 is located a distributor 10 designed to distribute the incoming gas uniformly across the section of the tower and to restrict whirling and eddying of the gas as it enters the tower. The distributor 10 is positioned above the soap nozzles 2 so that at the time the gas comes into contact with the soap particles issuing from the nozzles it is distributed reasonably uniformly across the tower and is proceeding downwardly through the tower in an orderly manner of flow without substantial whirling or eddying. Thus, the particles of the sprayed liquid soap are carried downwardly in orderly positively controlled flow through the tower by the drying gas. The drying gas comes into contact with all of the sprayed particles of soap at substantially the same temperature, and all of the particles are positively propelled through the tower so that every particle is subjected to a similar treatment by the drying gas for a substantially similar length of time. As here shown, the heated treating gas supplied to the tower 1 through duct 9 consists of products of combustion from the oil burning furnace 11 diluted and reduced to the proper temperature by air admitted to the system through the damper controlled opening 18. Further dampers 19 and 20 are provided for facilitating operation and permitting ready regulation and control of air volumes and air temperatures. The * * * contents of the tower are continuously discharged through the * * * opening * * * at the bottom of the tower. * * *

"The individual component rounded particles of the present product *are ordinarily*

*hollow unitary bodies.* Each particle is a detached unit consisting of a shell or wall of the dry soap material solidified into the characteristic rounded particle shape and enclosing within it a single void or hollow space. The unitary hollow particle structure is shown in * * * (the figure). This is in contrast to a spongy material consisting of granules or particles of sponge-like or honeycomb structure. In such products the component particles are usually of irregular fragmentary character and the interior of the particle is a mass of interlacing walls and pores rather than a single void. The thickness of the walls of the particles is controlled by the conditions of the process and may be varied depending upon the characteristic desired in the finished product such as particle size, bulking weight, speed of solubility, etc. The practical limiting minimum thinness of the particle walls is determined by the wall strength which is required to prevent the particles from crushing or breaking under the conditions normally encountered in bulking of the product in bins, handling it through conveyors and filling machines, and shipping it for use. The particles of the present product are made sufficiently stable so that they will withstand such normal handling and shipping conditions without breaking down. This hollow unitary particle structure is important in making the product quickly and completely soluble and at the same time providing a product of substantial particle size which is free from dust, stable, and free-flowing.

"Soap products made by spraying molten soap as heretofore proposed are normally of shredded and fragmentary particle form. The novel structure properties of the present product just described are the result of certain particular process conditions. To obtain from the usual molten soap the characteristic rounded particle formation and to produce a product substantially free from excessively elongated particles, shreds, and the like, it is necessary that the temperature of the soap as sprayed be controlled within a proper range. * * *

"Definite spaces or interstices between the particles are clearly evident, and these spaces appear clean and free from any dust or fine powder. The product illus-trated in Figures 2 and 3 (of the patent) is, as stated above, of an average particle size of about 0.75 mm. In this product substantially none of the particles are as large as 2 mm. in diameter; 100% of the product passes through a 10 mesh sieve in which the openings are 2 mm. square. Of this same product 85% to 90% passes a 20 mesh sieve (sieve openings 1 mm. square) while only 15% to 20% of the product passes a 40 mesh sieve (sieve openings 0.5 mm. square). Only about 5% to 8% of the product passes a 60 mesh sieve (sieve openings 0.3 mm. square), and only about 1 to 3% of the product passes a 100 mesh sieve (sieve openings 0.15 mm. square). The fact that no substantial part of the product is of sufficiently small particle size to pass a 100 mesh sieve shows that the product is practically entirely free of objectionable fine material or dust."

It is but fair at this point to set forth appellee's defenses and its position in general.

It disputes and challenges many facts asserted by appellants in their historical statement; denies that it followed the teachings of Lamont; asserts itself to be the pioneer and always a leader in the art; insists that Lamont was but a novice who played with soap making for a few days and never learned more about the science and art of laundry soap making than a sciolist. We are required to pass on fact issues and scientific disputes involving matters wherein the parties are hopelessly in disagreement. Appellee also denies that it followed Lamont but it claims its product and process are its own and the result of changes following experiment and that its soap and the process by which it is made is covered by its own patents Nos. 1,779,516 and 1,779,-517, dated Oct. 28, 1930.

The District Court found for appellee and made findings which adopt the contentions of appellee, on both validity and non-infringement. They are complete. Our failure to accept certain conclusions therein appearing is due to the fact that the evidence (physical exhibits) upon which they are based is all before us.

Below is set forth the substance of such findings, slightly abbreviated.[2] The

[2] "Findings of Fact.

"Filed September 13, 1935.

"1. Plaintiffs are the owners of United States Letters Patent Reissue No. 16,-749 to Robert L. Holliday, dated Sep-tember 27, 1927, and No. 1,652,900 to Dallas R. Lamont, dated December 13, 1927, together with all rights to sue for past infringement.

"2. (Appellee makes at Hammond,

findings although somewhat long are helpful in stating and narrowing the issues.

The Issues. The issues in controversy are more numerous than in the usual patent suit. The appellee asserts the patent is invalid for want of invention, and the determination of the force and validity of this contention necessitates a separate consideration of the product and the process claims. Appellee also challenges invention on the ground that Lamont was not the first inventor; in fact he was not the first or even a subsequent inventor. On this issue, purely one of fact, there is

Indiana, a soap product called Rinso.)
* * *

"3. The product * * * is a bulk product, * * * sold in cartons and is made up of a large number of relatively small, generally globular or potato shaped particles of soap which are rapidly soluble, 15% dust, and moderately free flowing, and are the result of spraying fragments of irregular pieces of molten soap at a sufficiently high temperature into drying air of sufficiently high temperature and volume so as to convert the fragments into particles which are capable of retaining and do retain their form and structure. The product contains about 20% of hard particles of irregular shape and not substantially puffed.

"4. Soap is a unique substance differing from all other substances that were spray dried prior to the work of Holliday and Lamont and presents problems to those attempting to spray dry it that are not presented by nor overcome in spray drying other products * * *.

"5. Products previously spray dried such as milk, coffee, maltose, blood; soap powder, sulphite liquor, sodium silicate, tannin, quebracho, eggs, etc., differ markedly from soap in their qualities and reaction to spray drying and the spray drying thereof presents different problems from those encountered in handling soap, and different results from the result of spray drying of soap.

"6. Prior to Holliday and Lamont the spray drying process had long been in commercial use in the treatment of materials similar to soap in their film-forming, cohesive or syrupy character, the materials being sprayed in highly concentrated and heated condition concurrently into a descending column of heated air, forming products composed of rounded, hollow particles traveling with the air which were separated therefrom after the drying operation had been completed.

"7. The adjustment of the variables of concentration, temperature of the material as sprayed, temperature of the treating gas, quantities of material treated relative to the volumes of treating gas employed, character of nozzles employed, and in the case of pressure nozzles, spraying pressure used, to determine the character of the product and the particle size thereof were well known.

"8. It was known how, by controlling such conditions to spray dry such materials into products of desired particle size from dust size to that which would be held upon a 40 mesh screen and that larger more inflated particles are produced at higher air temperatures.

"9. The prior art taught that kettle soap could be treated by the process by rendering it fluid by heat and spraying it into heated drying gas. It was known to spray dry kettle soap by heating it to a temperature at and above the boiling point of water and spraying it into heated drying gas. The prior art knew that the rounded hollow products of the spray drying process pour readily in dry form and possess great solubility· that products of very small particle size, dust size, tend to ball and lump when poured or stirred in water whereas with products of coarser particle size there is less tendency to ball and lump and they are therefore more readily soluble.

"10. The only commercial materials which the soap maker produces in fluid form and which are therefore to be reduced to solid form are kettle soap and kettle soap containing alkali additions (filled soap). The soap maker knew how to render such soap more fluid and therefore sprayable by controlling the temperature and also by alkali additions and this had been explained and defined in a printed publication prior to Holliday and Lamont, and kettle soap or filled soap had been sprayed by the defendant in the manufacture of Rinso since this product was first marketed.

"11. The normal result of spray drying soap in the prior art apparatuses of Brindle, Fleisher and Pease is the production of a product composed of rounded, hollow, expanded particles similar in character to those of the patents in suit.

"12. Defendant's accused product, Rinso, is an aerated product made up essentially of a wide variety of particles in respect of size and structure comprising dust, hard particles and spongy or honeycombed particles, all of more or less irregular exterior which characterize the product. It contains only a small proportion (about ten per cent) of round and hollow particles such as described

sharp controversy and each side is supported by persuasive argument. No finding of fact on this issue was made by the District Court. On the issue of infringement appellee contends that its soap does not respond to the product claims of the patent. It asserts that the soap particles are radically different in shape and uniformity as well as in other respects. It also insists (a) that its method of making soap differs from the steps described in the process claims; and (b) the methods followed in making its soap were but improvements of the process and steps by it

---

and illustrated in the Lamont patent. It is not uniform according to the Lamont definition, having a uniformity value measured according to the Lamont patent, of less than .50 as compared to Lamont's uniformity of .75. It tends to cake in the carton, is not free flowing and is not free from dust. It does not have the appearance of a collection of little balls of soap. A small though substantial portion thereof sinks when poured on water. Rinso has specific gravity of .33, at least three times that of Lamont's preferred product. It does not respond to the Lamont test of solubility, nor is it free from a tendency to lump when poured in water.

"13. The process of the Lamont patent and the production of his product requires a soap line temperature of 220° F. which corresponds to a temperature of the soap as it is sprayed from the nozzle of about 256° F., whereas Rinso is sprayed at a temperature of the order of 190° F. Lamont's process requires an initial air temperature in excess of 450° F. for the production of his product made from filled soap, whereas in defendant's process the air temperature is always less than 400° F. Lamont's process requires a volume of air of the order of 30,000 cubic feet per minute measured at 475° F. per ton of product produced per hour, whereas the Rinso process employs only about 8,500 cubic feet of treating air per minute per ton of product produced per hour.

"14. Lamont describes his process as one of steam inflation and requires a temperature of the soap as sprayed and a treating air temperature and volume in proportion to soap treated such that steam inflation is produced and maintained, whereas defendant's process employs soap and gas temperatures and gas volumes which are very much lower than Lamont's and which preclude steam inflation.

"15. Defendant employs soap and air temperatures which the Lamont patent states will not produce his product.

"16. Lamont's process is designed to secure uniformity of product and particle size by uniformly spraying the soap at temperatures and under conditions to prevent stringing and irregularity in particle formation and to produce rounded drops, concurrently into a current of treating air flowing uniformly down the spraying tower, the air and particles moving together through the length of the tower and then to a collector in which they are separated, whereas in the Rinso process the soap is sprayed in irregular sheets and strings horizontally transversely of the chamber from a plurality of nozzles located at different heights in the tower, the air being introduced in a swirling current above the several nozzles, the bulk of the air being introduced at the lower-most nozzle and the bulk of the soap at the uppermost nozzles, the air being drawn off at the top of the tower and the bulk of the soap particles falling through the tower and being collected at the bottom whereby the particles of soap are given irregular non-uniform treatment in swirling currents of air and drop through the tower counter-current to the travel of the treating air.

"17. The operation of the crutcher, loop line and booster tank in defendant's process is such as to introduce air into the soap as sprayed to the extent of approximately 12%.

### "Conclusions of Law.

"1. The Lamont patent as to its process and product claims is not infringed by the defendant's accused Rinso process and product either in substance or in terms.

"2. The Lamont patent is invalid unless limited both as to its process and product claims to the specific process and product disclosed by way of specific example and as so limited is not infringed.

"3. The Lamont patent is invalid unless limited to a process of controlled steam inflation and the product thereof and as so limited is not infringed.

"4. The process claims of the Lamont patent are invalid unless limited to a process in which there is employed a sufficient volume of drying gas at a sufficiently elevated temperature to maintain the particles in their steam-expanded condition until sufficiently dry to retain their form and size, and as so limited are not infringed.

"5. The Bill of Complaint is without equity."

followed in making its laundry soap for years prior to Lamont's entry into the industry.

The logical disposition of the determinative questions calls first for a consideration and disposition of appellee's challenge of Lamont's inventorship. The precise question which is here raised may be stated thus: Was it not Holliday rather than Lamont who made the discovery, etc. set forth in the Lamont patent?

Both these gentlemen, Holliday and Lamont, were employed by the same company, the Industrial Waste Product Corporation (otherwise known as Industrial Spray Drying Co.), which was engaged in rendering laboratory services to industries of various kinds. Among its employees were three men of more than ordinary technical knowledge. They were Paul D. Zinzinia, Robert L. Holliday, and Dallas R. Lamont. Holliday had chemistry and engineering training. Lamont had engineering training and acted as patent solicitor, being licensed to practice in the United States Patent Office. Both gentlemen were under agreement to transfer their discoveries and inventions and patent applications to their employer.

Undoubtedly Holliday was the first to make experiments with soap. Industrial Waste Products Corporation was embarrassed financially and most anxious to hit upon a product and to make a discovery which would enlarge its activities and balance its budget. Industrial Waste Products Corporation had in other fields engaged in what is known as spray drying.

Securing a kettle of soap from the manufacturer, Holliday began his experiments, working with kettle soap which in the raw material form was 30% water. Holliday applied heat before spraying the product. .The results of his various experiments were written up in the form of a report. Other experiments were undertaken and other steps followed and additional reports were recorded. As a result of Holliday's experimental work it was decided by him or his employer that he should apply for a patent. Lamont acted as his solicitor. Patent No. 1,621,506 cov-

ering "The manufacture of a finely divided dry soap product" was issued upon Holliday's application which bore date of April 19, 1926. It was issued March 22, 1927. It is apparent that Mr. Holliday subsequently believed that he had secured too broad a patent and he filed a disclaimer. Thereafter Holliday left the employ and Lamont continued to make experiments in the soap field. As a result of what he learned from Holliday or from his own experiments, or both, the application for the patent in suit was by him filed, and very shortly thereafter the patent here in question was issued and by him assigned to his employer. Neither Holliday nor Lamont is financially interested in the outcome of this suit.

The controversy between Lamont and Holliday is sharp and unyielding. The burden of proof looms large as the determining factor of this issue.[3] This burden rests upon Holliday. The presumptions favor Lamont.

Holliday made a written statement of his discoveries in 1927. He at that time applied for a patent and, under oath, he set forth his discoveries. Tested by the action of other inventors acting under similar circumstances and seeking patents to protect their discoveries, it is fair to assume that the full strength of the discovery would be set forth by the applicant. Why not? What he did not claim, he waived—he lost. If he claimed more than what he could prove himself to be the first to have discovered, the Patent Office would reject the excess as non-patentable. Experience has demonstrated that the usual discoverer asserts more rather than less than he is entitled to. This is partly due to the fact that he does not know what others have invented or discovered.

In the instant case therefore, we must assume that Holliday set forth all his discoveries when he applied for his patent. Most significant therefore is the absence of a disclosure of the discovery which Lamont later asserted to be his.

However, this is not all. After the patent was issued to Holliday and he had read

---

[3] Cline Electric Mfg. Co. et al. v. Kohler (C.C.A.) 27 F.(2d) 638; H. Mueller Mfg. Co. v. Glauber (C.C.A.) 184 F. 609; W. W. Sly Mfg. Co. v. Central Iron Works (C.C.A.) 246 F. 707; A. Schrader's Sons, Inc., v. Wein Sales Corp. (C.C.A.) 9 F.(2d) 306; Hobbs Patent Co. v. Atlas Specialty Mfg. Co. (C.C.A.) 244 F. 176; Moline Plow Co. v. Rock Island Plow Co. (C.C.A.) 212 F. 727; Guy v. Stein (C.C.A.) 239 F. 729; James Clark, Jr., Electric Co. v. U. S. Electrical Tool Co. (C.C.A.) 245 F. 753; Donner v. Walgreen Co. et al. (D.C.) 44 F.(2d) 637.

it and meditated over it, he concluded there was a mistake in the statement of his discoveries. He sought to correct the mistake appearing in specifications and claims. Here again Holliday had the opportunity to make claim to the discovery covered by Lamont's patent, if omission existed in his original claims and specifications. Instead we find that Holliday corrects the original application by stating that he had been granted too broad a patent. In other words, his discovery had been too broadly stated, and he therefore sought to limit and restrict the patent previously issued to him by filing a disclaimer.

In the face of such a record it is hard to find that Holliday erred when he sought to narrow the statement of his discovery when he might have broadened it so as to include as his, something he did not suggest when he filed his original application, nor claim when he filed his corrected and amended application.

On the other hand, there was persuasive evidence produced at the trial which supported appellee's argument. It seems that Holliday wrote a report of each of his experiments, when working for Industrial Spray Dryer Company. Likewise, the product which resulted from his experiments was placed in a tin can and marked by the report number. Sometime after the patent was issued and after the Industrial Spray Dryer Company had transferred the patent to Colgate-Palmolive, a receiver was appointed for the former company. Its assets were sold. Various cans containing the products which resulted from numerous experiments were considered valueless. Some of them had been transferred to a warehouse where they were left neglected for many years.

At the time of the trial one of these cans bearing the Holliday experiment number was produced in court to prove that the soap therein found responded fully to the claims of the Lamont patent. In other words, appellee offered the product found in this can as soap such as is described in Lamont's patent. It was offered as the product of the Holliday test.

It would serve no useful purpose to set forth in detail all the evidence in support of the positions taken by the contestants nor to elaborate the reasons for the conclusion which we have reached. It is apparent that the dispute is not one which can be determined with that absolute and mathematical certainty which marks the

disposition of some fact issues. We confess the arguments on both sides are rather persuasive.

Our conclusion is in favor of Lamont. We find him to be the original inventor of the soap product and processes by him described in the patent in suit.

In view of this finding it will not be necessary to dispose of a legal question which is the subject of considerable judicial difference of opinion. We refer to the issuance of a patent to an employee of a company, entitled (by agreement) to the inventions and discoveries of its employees, where two employees work in the same laboratory on the same subject matter and the employer in good faith selects one employee to file the patent application and the infringer asserts that the discovery was made by the other employee, whose discovery also belongs to the employer.

Respecting this question this court sometime ago said:

"If a corporation (incapable of being an applicant for a patent) should employ a score of experts in its laboratories to improve the processes and the products of the corporation, it should be of no concern even to the government * * * to prosecute an inquiry and make a specific finding on the question whether the invention was single or joint and just what part each expert took in perfecting the improvements; and surely a stranger, who is taking advantage of the disclosures in the patent, ought not to escape on the contention that the government made a proper grant but erroneously or wrongfully recognized the wrong person as applicant." Bestwall Mfg. Co. v. United States Gypsum Co. (C.C.A.) 290 F. 798, 799. In conflict with this statement of the law see, United Chromium, Inc. v. General Motors Corporation et al. (C.C.A.) 85 F.(2d) 577.

As bearing upon the effect of the employee's (who the infringer asserts made the discovery) failure to file the application, see, Mason v. Hepburn, 13 App.D.C. 86. See, also, Brydle v. Honigbaum (Cust. & Pat.App.) 54 F.(2d) 147, and cases there cited. For an interesting discussion of this question see Vol. 18, Journal of Patent Office Soc'y., pages 257, 339.

If an employer who owns the inventions of his employees and is entitled to the patents issued thereon may nevertheless have his patent invalidated at the instance of an infringer when he in good faith names one of two employees as the inventor and the

other employee takes no steps to assert his patent rights as first discoverer, then legislation is needed to avoid such possibilities.

We appreciate that the legal question arising out of the ownership of inventions of two employees, who have agreed with the employer that the latter is entitled to their discoveries, is entirely separate from the fact issue which arises out of the controversy over who was the first inventor, Holliday or Lamont. This issue of fact we have met squarely and our determination is in no way affected by the said legal question. Our conclusion that appellee did not overcome the burden of proof which on it rested necessarily carries with it, the disposition of the ultimate fact issue, namely, that the soap found in the can in the warehouse long after Industrial Waste Products Corporation had sold its assets and ceased to function was not the soap made by Holliday in his experimental run No. 142.

We are not seriously impressed by the prior art disclosed in spray drying milk, blood, sulphite liquor, etc. Neither was appellee impressed by this prior art when it applied for and secured patents Nos. 1,-779,516 and 1,779,517 (to Stevenson) issued October 28, 1930. When these later applications were filed, the so-called crowded art which appellee now argues excluded Lamont, was not so crowded but that the Lever (Stevenson) applications were presented and allowed. In other words, the art which appellee says should now exclude Lamont did not bar Lever although its patents were issued some years later. An examination of the Lever patents shows nothing if it does not show the result of Lamont's teaching.

The practices disclosed in the so-called prior art were in different fields, in most instances in a non-analogous art where radically different problems were presented. See Finding No. 5.

The Holliday patent (a prior art patent) belongs to appellants. Its teachings do not anticipate Lamont's patent. Whether Holliday was not the first inventor presents a most serious and vexatious question, but once it is determined, no obstacles in the way of anticipation by this patent, appear. Holliday's patent only serves to impress us with the patentable character of Lamont's alleged advance, as well as with its asserted merit. The step which Lamont took over Holliday was not a long one but in results it was most important.

If the Lamont discovery, both process and product, were old, it is passing strange that the appellee did not follow the old practice and make products accordingly. Persuasive indeed is appellee's action in 1929 when its current Rinso came on the market. It approached, but did not exactly make, the Lamont product. Its approach was governed not by the demands of the laundry soap user but by the language of appellants' patent which it sought to avoid. Why keep 15% of dust or 1/10th of that amount? Undesirable, it admittedly was. Dust cheapened the value of the soap. Appellee reduced the dust content. Why not wholly eliminate it? The conclusion is inescapable that it was not wholly eliminated because of the possible use of its presence in patent infringement entanglements with Lamont's patent. Strange indeed was such action by one who really believed that it had the right to make the Lamont soap because of the existing prior art.

The same may be said of the inferiority in matters of uniformity, shape, and existence of voids in the center of some particles of its soap. All these qualities or characteristics are admittedly valuable and desirable. Why approach them relatively as appellee did, yet not go the entire distance? Avoidance was not due to inability to make the product under the Lever practices for Lever *did produce* the *perfect product* on certain occasions. Plaintiffs' Exhibit No. 23, BEAX, is conclusive proof of such fact. Purchased in the open market there is no doubt of its being appellee's soap, nor is there question of its compliance with Lamont's product claims no matter how rigidly we hold Lamont to the strictest construction of the language of these claims.

True, appellee may avail itself of inconsistent defenses. No prejudice arises by reason of the fact that it asserts that the prior art precludes Lamont but not its own later patents. However, in appraising Lever's action as distinguished from recognizing its right to present inconsistent defenses, we must make and weigh the unavoidable inferences. The significance of its action is not avoided by acknowledging its right to assert inconsistent defenses. It seems impossible to conclude that one who could avoid

dust, and did not, when avoidance was highly desirable, was not thoroughly convinced that the Lamont patent was neither meritorious nor novel.

As bearing upon the validity of the claims, both product and process, it is first absolutely necessary that we appraise and place the Lamont patent in the laundry soap art. Is his contribution outstanding, or was he merely the producer of a paper invention, a patent whose principal value lay in the awesome and forbidding notice which a licensee prints on his product? Did the industry change its product after his discoveries were made public? And, finally and most important of all, *did Lamont do something of value, did he help produce a better article in this*—an industry which is prone to advertise and at times without too keen a regard for modest conservative speech? Or was Lamont simply another dreamer stronger at word painting than in scientific research?

We are impressed by the following facts which bear upon Lamont's contribution to the art: (1) A suitable and satisfactory washing soap must not only satisfy the user, but must be made and distributed at low cost. (2) Experience has demonstrated that the use of a carton which can be handled easily and transported cheaply without breakage or injury to its contents is an important merchandising asset. A *packaged* soap was a necessity and all producers faced such fact. (3) Soda ash, which was widely used in soap making, is undesirable in laundry soaps. Strong evidence against "old" Rinso and the highest tribute to Lamont is found in the changing advertisements on Rinso's cartons and later, in Rinso's soda ash reduction. (4) In 1919 Rinso had 30% of soda ash; in 1927 it was reduced to 20%. In 1929, after adopting the process of spray drying, the content was reduced to less than 4%. Appellee denies that it reduced its soda ash content in the volume stated or that it was due to Lamont's teachings, but the facts speak for themselves. (5) On the 1919 Rinso carton, directions were given which called for removal of particles of soap to a separate container and there treated and thereafter poured into the wash tub. As a result of the spray drying process, Rinso is poured directly from the carton to the tub and the soap rolls freely onto the water. (6) Particles of soap so fine as to be called dust are objectionable. They disappeared largely and in some instances entirely in Rinso after spray drying. The carton shows the particles of soap *rolling* from the carton. (7) Hollow globular particles of soap are desirable in that they furnish relatively large soap surface area to soap content and dissolve readily and completely. They pack well in cartons and they flow readily from the carton so that the user spreads them satisfactorily over the surface of the water into which they are readily dissolved. The more uniform and the larger the percentage of globular hollow particles with the least possible percentages of soda ash, the better the laundry soap product. (8) Appellee well nigh dominated the laundry soap market in 1927 with its *intermediate* Rinso. By 1930, it was making 175,000,000 cartons of its *current* Rinso which was spray dried.

Appellee attacks the validity of the patent because indefinite. It is particularly urged that the process claims are lacking in specificity. In answer thereto it may be said that appellee had no difficulty in understanding or following the teachings of Lamont.

No objection exists to a description solely because it calls for the application of heat sufficient to produce a certain result, or to percentages in terms of results. This court held a step sufficient which used the words "over-liming." Wisconsin Chemical Co. v. Chute (C.C.A.) 261 F. 89.

So here, "preparing a molten soap" quite definitely describes a step. "Maintaining the temperature of said molten soap sufficiently high so that it is reasonably fluid" is understandable and intelligent. "Keeping the soap molten and its temperature high" so that it may be reduced by "spraying to reasonably divided particles" is less definite, but sufficiently so when we conclude that the inventor was speaking to those skilled in an art wherein practices necessarily required changes in temperature due to volume run and in the size of the apparatus used.

If we were otherwise in doubt, validity of the patent would be sustained because of the extensive use of the soap manufactured by the appellants under this patent. Wahl Clipper Corp. v. Andis Clipper Co. (C.C.A.) 66 F.(2d) 162; Therm-O-Proof Insulation Co. v. Slayter & Co. (C.C.A.) 80 F.(2d) 557. Moreover, the change in appellee's Rinso is in itself a high tribute to Lamont.

Appellee argues, and persuasively, that the enormous sales of this soap are due to the expenditure of millions of dollars in advertisements and to the unexcelled efficiency of the sales departments of the three competing soap companies. That these competitors have extensively advertised their products will hardly be denied. Moreover, the sales departments are so efficient that a prospective user must indeed be elusive to escape them.

Notwithstanding the dangers of overestimating this factor of extensive use we are impressed by the public's acceptance of this particular kind of laundry soap.

The argument that the parties to this litigation always made extensive use of advertising may even be viewed as an argument favorable to appellants. So completely did appellee dominate the field in 1927 that it would never have changed its Rinso soap except as it was compelled to recognize the superiority in fact, as well as in appeal to the users, of the Lamont soap.

Infringement. Appellants argue and the court found that appellee's soap did not infringe the claims of the patent.

The effect of the District Court's finding is somewhat impaired by the observation:

"Lamont patent is invalid *unless limited to a process of controlled steam inflation* and the product thereof and as so limited is not infringed."

We do not agree that the discovery is a minor one or that the patent must be given a narrow construction. Only a liberal construction of the claims will consistently recognize the character of the patent.

Avoidance of the claims is predicated, in part, on the fact that the claims in suit call for "a generally rounded globular shape" for the component particles. It is therefore imperative to ascertain the necessity and the importance of the shape of the soap particles.

One of the claims described the component particles of the soap product as being "a generally rounded globular shape" with "the characteristic and distinguishing appearance of a large number of independently visible individually distinct little balls of soap." Another claim refers to the particles of "rounded generally ball-like shape" and consisting of a "shell of dry soap material solidified into the said characteristic rounded shape embodying substantially a single principal void." Another claim describes the particles as "characteristically rounded hollow generally globular form, substantially as illustrated and described." Still another claim refers to the particles of "generally rounded conformation substantially as illustrated and described."

Still another claim describes the "component particles of the regular commercial run" as "individually distinct hollow unitary bodies of rounded generally ball-like shape, substantially as illustrated and described," adding further "and individually constituted as independent particles consisting of a shell of dry soap material of thickness averagely not exceeding 0.1 millimeter solidified into the said characteristically rounded shape embodying substantially a single principal void, the relatively large hollow form and the individually distinct character of said particles giving to the product the property of definitely resisting formation of masses of undissolved soap in water," etc.

We have heretofore quoted at length from the specifications to emphasize, if necessary, the fact that form and uniformity are the essence of the invention, along with absence of dust.

Appellants' emphasis upon these qualities appears in figures and drawings. In fact, we do not understand that they question the necessity of this quality in an infringing article.

From our study of the soaps which were offered in evidence and our study of the photographs which have been enlarged and reproduced, we cannot escape the conclusion that there is a difference between appellants' soaps made in accordance with the patent teachings, and appellee's intermediate soap "Rinso." The same may be said to be true to a much greater degree of its "old" Rinso. The soap offered by it as its "current" soap (sometimes called modern) cannot do what is claimed for appellants' products. In other words, the degree of the free-flowing character is dependent upon the uniformity and the rounded, generally ball-like shape of the particles. Likewise, quick and easy solubility is traced to uniformity and to the fact that the particle walls are thin and generally globular in form.

Appellants are entitled to a reasonable range of equivalents. At best the terms used by Lamont are relative. There seems to have been a studied effort to approach

the globular shape, yet to avoid infringement. This was appellee's privilege. Only in case it skated too near and crossed the line, did it infringe. With magnifying glass and otherwise we have examined the appellee's product.

We herewith present enlarged reproductions of the soap products:

Fig. 1—Finished soap described in the Lamont patent.

Fig. 2—Soap produced by Colgate-Palmolive under patent.

Fig. 3—Soap produced by Procter-Gamble under the patent.

Fig. 4—Soap produced by Rinso—BEAX.

Fig. 5—Rinso soap prior to Lamont patent.

Fig. 6—Soap known as current Rinso soap produced by appellee on the trial.

Fig. 1. Fig. 2. Fig. 3.

Fig. 4. Fig. 5. Fig. 6.

Appellants insist that Rinso soap, Fig. 4, known as the BEAX type, must be used in determining the characteristics of appellee's soap. Appellee desires its soap to be judged by products it furnished and which it claims embodies its soap, but contains more dust, a fewer number of round particles, and is less uniform, etc., than Lamont's. They are inferior no doubt to the product described in the patent, but infringement, not inferiority, is the subject of our inquiry. Nor can we ignore the presence of dust in some of the samples of Rinso soap. Elements (b) and (c) of claim 2 describe particles in such a way as to negative the presence of dust when made by the Lamont process. Lamont intended to describe and did describe a soap product without particles so small as to come within the classification of dust. There is some oral opinion evidence to support the finding of the District Court that 15% of current Rinso soap is dust. Counsel for appellants insist that 15% is too high in any current Rinso soap and certainly much higher than exists in samples by them submitted. We are confronted by many samples of Rinso and find the contents to vary materially. Some approach, if they do not squarely fall within, the product claims. In fact there is before us an exhibit marked as current Rinso BEAX (Plaintiffs' Ex. 23) which is dust free and the soap particles are uniform, generally globular and for the most part, hollow. We are convinced that this product infringes the product claims of the Lamont patent. We have not examined a single sample of current Rinso where the dust equals 5% of the entire body of soap.

While this is a matter of opinion based on our observations made with a magnifying glass, we cannot in the face of it delegate to a partisan witness, expert or layman, the duty which rests on the court. There are products where there is a little, or no dust. Appellee asserts that the sample known as Rinso BEAX, Plaintiffs' Ex. 23, is unusual and does not truly represent its product. They seem unable to account for its existence. Appellants say they purchased the sample in the open market in 1932 and no serious question is raised in respect to its genuineness as appellee's regular commercial product.

■ Lamont might have inserted additional claims or modified the language of existing claims so as to have made them broader and more comprehensive and inclusive. Such claims might have covered soap with a *reduced* amount of dust and which would have had a *substantial* amount of round and ball like particles with hollow bodies. However, Lamont chose to make the claims more rigid and specific and must be bound thereby. He chose his own language. We must accept his words as they were presented to, and accepted by, the Patent Office. We are not permitted to rewrite a claim even though Lamont's discovery would have justified a broader one. Nor can we do indirectly, that is by construction, what we can not do directly.

Our conclusion is that all soap made by appellee which corresponds or is substantially like the BEAX sample of its current Rinso infringes the product claims. If there be any current Rinso soap with 15% or more of dust or which has a limit (say 50%) of particles which are not hollow and globular, then infringement of the product claims is not disclosed. In construing the qualities, globular and hollow, their purpose must be considered. Substance, not form, thought not words, must control the court's decision. All particles need not be hollow nor globular.

In determining infringement, the district court must give to dust a relative, a non-technical meaning. Soap particles so fine as to float in the air and disagreeably affect a user should be called dust. Particles which do not rise and offend the nostrils of users are not dust.

It is unfortunate that this issue of infringement of product claims cannot be more definitely determined. We have chosen the sample BEAX (Plaintiffs' Ex. 23) because it infringes. We are unable to say with sufficient certainty, to make a finding thereon, that it is the exception or the rule in current Rinso soap. It, and this discussion, must furnish the guide for avoidance of the injunction which must issue, and determine the amount of damages, if any, which resulted from past infringements.

■ Appellants' burden with respect to proving infringement of the process claims is not as great as existed in respect to the product claims. The process claims are broad whereas the product claims in some respects are not as broad as the discovery. By imperfectly practicing the teachings appellee might have produced a soap which would not respond to the language of the product claims. It could not however avoid

the infringement of the process claims by *imperfectly* practicing the process. To illustrate, the heating, the drying, the spraying, the application of the gas, might be such that in the product there is dust, and a substantial number of the particles are not globular or they are not hollow in substantial quantities. We would then have no infringement of the product claim. There could, however, be infringement of the process claim. Infringement is not avoided simply because the defendant does not employ the plaintiff's invention to as good advantage as he might whereby a less desirable soap is produced. If the process be the same in kind, that is, according to the spirit of the practices set forth by the patentee in his patent then infringement of the process occurs. We see no reason why a narrow range of equivalents should be adopted. On the other hand every reason exists for our according the process claims a reasonably wide range of equivalents.

In its desire to avoid infringement appellee has kept its eye too closely on the product. The inference is that avoidance of the product claims, necessarily avoids the process claims. If this last statement were correct the defense of non-infringement to the process claims might in large part at least be upheld.

Such, however, is not the true test, and for several reasons. The product claims may be too narrow to truly protect the discovery. Their avoidance may be accomplished when infringement would have resulted had the claims been broader. Again the product may not be patentable due to the absence of patentable novelty. And, finally, the process may be followed but in such a way as to produce a product that is not up to the desired quality and not within the claims of the broadest patent.

Appellee's product, Rinso, apparently varies in uniformity of quality. The samples show a degree of variance which suggests possibilities of a soap of the excellence described with the glow and enthusiasm of appellants' counsel when they speak of Lamont's product. In other words the process may be followed and yet the product not be up to the possibilities of a better or more complete following of the teachings of the process claims.

For these reasons we cannot determine infringement of the process claims by look-

ing to the product to see if the product claims are infringed.

From the discussion, already too long, it must be apparent that non-infringement, rather than non-validity of claims, is the close and troublesome question in this case. The issue of non-infringement is so close as to be most worrisome. Our final conclusion turns upon the degree of equivalency which should be granted the elements of the product, and the steps of the process, claims.

Degree of equivalency depends largely on (a) the place we give Lamont's discovery in the laundry soap art; (b) the language of the claims and specifications; (c) the object and purpose of the steps (or elements in the product claims) in the consummation of the "Lamont idea."

To illustrate the significance of (c), take the form of the particles of soap. Is a spherical more desirable than a globular particle? Will "egg shape" or "potato shape" accomplish the same purpose? The answer must be found in the purpose of globular over square, jagged or slat-shaped particles. These particles are globular that they may roll more freely and spread over the surface of the water more readily. Obviously, it is not a matter of perfection. The purpose does not require a spheroid. It is sufficient if the particles roll readily.

What of uniformity? To define the true degree of uniformity requires us to again look to its purpose. We are dealing with small particles,—only a tiny fraction of an inch in diameter. The reproductions on a previous page have been enlarged from the original many times (18). Are the accused products sufficiently uniform to roll freely; to dissolve readily; to avoid solidification? These are the decisive factual questions.

And what of the temperature in the process claims? Does appellee avoid infringement by using high temperatures in each step as taught by Lamont, yet keeping a few degrees below the temperature degrees stated in the Lamont specifications? (The temperature degrees are not mentioned in claim 7.) Is the heart of this discovery the adoption of specified temperature readings or of the use of high temperatures for heating soap to make it fluid, etc.? We would be doing injustice to the patent if we did not consider all these factors. Our conclusion must be and is based

196

upon the substance of the teachings, not solely upon the words used.

█ Restrictive words must be given their true meaning even though a worthy invention be rendered valueless thereby. But words which arc ordinarily restrictive in their meaning may be words of description and not intended to tie the patent by inelastic bands. When restrictive words mark boundary lines which are of the essence of the inventor's discovery, we should not and cannot expand them. There are, however, characteristics which are hard to describe. These characteristics or qualities are usually accepted in ordinary speech as relative. They are somewhat elastic. Such a quality is "round," more so is "globular." When descriptive words are of necessity somewhat general, we should accord them a reasonable, rational resiliency.

Our conclusions are: The product and process claims in issue of the Lamont patent are valid.

The process claims are infringed by the process followed by appellee at Hammond, in making "modern" or "current" Rinso.

Appellee's soap of the character contained in the bottle marked, Plaintiffs' Exhibit 23, infringes the Lamont product claims. The rule laid down in the opinion must determine whether the Lamont product claims are infringed by other products manufactured by the appellee.

The decree is reversed with directions to enter one which grants an injunction against future infringements of the Lamont patent (claims 1, 2, 3, 4, 5, 7, 8, and 9) and for an accounting for past infringements and containing such other provisions as appellants may be entitled to under the law and which are consistent with the views expressed in this opinion.