24 C.C.P.A.(Patents)
**JAMES v. CLAYTON et al.**

**Patent Appeal No. 3857.**

Court of Customs and Patent Appeals.
June 21, 1937.

Kenyon & Kenyon, of Washington, D. C. (Drury W. Cooper, of New York City, Maurice A. Crews, of Philadelphia, Pa., H. Frank Wiegand, of New York City, and Lee B. Kemon, of Washington, D. C., of counsel), for appellant.

338

Charles M. Thomas, of Washington, D. C. (Ford W. Harris, of Los Angeles, Cal., of counsel), for appellees.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in an interference proceeding from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority of invention to appellees.

The interference involves the application of Benjamin Clayton, Walter B. Kerrick, and Henry M. Stadt, Serial No. 534,533, filed May 2, 1931, and an application of Edward M. James, Serial No. 567,220, filed October 6, 1931.

The invention in issue relates to a process for the purification of vegetable and animal oils, and is sufficiently described in the counts in issue. Of the three counts in issue, Nos. 1, 2, and 3, Nos. 1 and 3 are illustrative. They read:

"1. In the purification of vegetable and animal oils containing free fatty acid, a continuous process comprising intimately mixing a measured quantity of oil with a measured quantity of alkali for a period of less than five minutes, thereafter passing the mixture continously through a heated conduit to raise its temperature to a degree which will facilitate centrifugal separation and then promptly centrifugally separating the refined oil from the resulting sludge and residual solution."

"3. A process for the purification of vegetable and animal oil containing free fatty acid, comprising continuously feeding in measured quantities separate streams of said oil and an alkali to a mixing zone, continuously advancing said oil and alkali to a mixing zone, continuously advancing said oil and alkali while in intimate physical contact through said mixing zone to effect a thorough admixture thereof, in passing the mixture discharging from the mixing zone as a continuously advancing stream restricted in cross section through a continuous elongated passageway, in raising the temperature of the mixture during its passage through said elongated passageway to a degree sufficient to facilitate its subsequent centrifugal separation, and in subjecting the mixture discharging from said passageway to centrifugal separation to separate the refined oil from resulting sludge and residual solution."

Counts 1 and 2 originated in appellant's application. The claim constituting count 3 was added to the interference on motion of appellees under rule 109 of the Rules of Practice in the United States Patent Office.

Counsel for appellant moved to dissolve the interference as to counts 1 and 2 on the ground that appellees were not entitled to make them; opposed the addition of the claim constituting count 3 on the same ground; and moved to shift the burden of proof, claiming that a prior application of appellant, Serial No. 517,112, filed February 19, 1931, disclosed the invention in issue.

The Examiner of Interferences denied appellant's motion to dissolve and his motion to shift the burden of proof, and granted appellees' motion to add count 3.

In denying appellant's motion to shift the burden of proof, the Examiner of Interferences said that there was no statement in appellant's application, Serial No. 517,112, "as to the length of time of mixing, nor as to the nature of the means in which heating takes place, nor as to whether centrifuging is to take place promptly, with respect to all of which the counts contain limitations."

In affirming the examiner's decision as to that issue, the Board of Appeals stated:

"Appellant urges the James application Serial No. 517,112, filed February 19, 1931, presents as good a disclosure of the invention expressed in the interference counts as will be found in the Clayton application. The James earlier application emphasizes a special reagent for the purification of fatty oils, namely, an aqueous solution of a poly-sodium phosphate. The specification is very general as to the procedure of mixing the oil and alkali and seems to state that the process may be employed in continuous or batch operation. In this interference we are concerned with an improvement in a continuous process.

"The Examiner in considering the question of shifting the burden of proof properly stated that certain steps in the process as defined in the issues are not disclosed in the very general statements of the earlier James application. This application states nothing of an intimate mixture for a brief

period and then passing through a heated conduit and promptly into a centrifuge. This application does not describe particularly a quick purification of the oil by a continuous operation. We are satisfied the Examiner's decision as to this earlier James application is warranted."

The only claim made here by counsel for appellant is that if appellees' application discloses the invention defined by the appealed counts, appellant's application, Serial No. 517,112, also discloses it.

We are in entire agreement with the tribunals of the Patent Office that that application of appellant does not disclose the invention defined by the appealed counts.

In his decision of October 10, 1935, the Examiner of Interferences, after a careful consideration of the evidence in the case and the applications of the parties, concluded that appellant was entitled to a date as early as May 14, 1930, for conception of the invention; that, due to the views he held, it was unnecessary to determine whether appellees conceived the invention prior to their filing date, May 2, 1931; that weekly reports made by appellant to the Sharples Specialty Company, his employer and assignee, on a series of experimental tests conducted by him on an apparatus (Appellant's Exhibit No. 1) from April to August 9, 1930, established that he failed to reduce the invention to practice during that period; that, although appellant was the first to conceive the invention, he was the last to reduce it to practice; and that, as he was lacking in diligence during the critical period, that is, from immediately prior to May 2, 1931, the filing date of appellees' application, and thereafter, until he filed his application, October 6, 1931, appellees were entitled to an award of priority of the invention, provided they could make the counts in issue.

With reference to the right of appellees to make the involved counts, the Examiner of Interferences referred to the evidence of record and appellees' specification, and held that appellees were entitled to make the counts in issue, and, accordingly, awarded priority of invention to them.

In its decision, the Board of Appeals discussed at considerable length the evidence relative to appellant's activities in his attempt to reduce the invention to practice, then, after quoting from some of the reports made by appellant as to his progress in his experimental work, among other things, said: "In considering an improvement in a method of purifying cottonseed oil, the results might be satisfactory in certain respects and not in others and it could hardly be said that such experiments were so satisfactory as to present a reduction to practice especially if the experimenter himself indicated dissatisfaction. This is especially true as it may be uncertain as to the actual results desired. Appellant urges he was seeking especially good results and that the results obtained in his experiments were satisfactory to a certain extent. This is questionable though James, in some experiments, carried out the individual steps of the process as called for by the counts. If the results were evidently unsatisfactory to the operator, how can it be said that such results are a satisfactory reduction to practice? What if James actually carried out the individual steps of the process as defined in the issues of the interference and got no particular results, could it be said that he reduced to practice under such conditions? We believe the examiner's position as to James' reduction to practice is warranted as the last experiments were seemingly much the same as to results as the first, and the final report indicated these tests would be continued at some future time. Furthermore, it must be remembered such tests were made in an experimental apparatus * * *."

—and, accordingly, affirmed the holding of the Examiner of Interferences that appellant had not reduced the invention to practice prior to his filing date, and that he was not diligent from immediately prior to the filing of appellees' application, May 2, 1931, and thereafter, until he filed his application, October 6, 1931.

With reference to the right of appellees to make the counts in issue, the board quoted the following from appellees' specification: "It is obvious, however, if the alkali is introduced closer to the oil supply A, which may be remote from the heater 3, premixing with the oil will take place in the pipe A' before reaching the heater 3 and step two," then said:

"Appellant urges vigorously there is no statement of intimate mixing of the alkali with the oil before entry of the mixture into the heater and that all the reaction takes place in the heater coil. He points to a statement in line 18, page 6, that the reagent

pumped· into the line A' 'in measured quantity enters the oil in filamentary form and performs its previously described reactions during step two.' Appellant notes also that in the testimony of various witnesses for Clayton et al, it is stated the reactions take place in the heating coil and no special emphasis laid ·on any special mixing of the oil and the alkali before ʻpassing into the heater.

"Appellee, on the other hand, submits evidence by experts to show in *injecting alkali into a flowing stream of oil (the word 'injecting' is found in line 2 of page 6 of the specification) a certain mixture of the oil and alkali would occur and when this mixture is passed through meter 14, pump 2, air chamber 9 and the various valves and connections between the point of entry of the alkali to the oil and the heater, intimate mixture of the oil and alkali will naturally occur.* Clayton et al definitely describe a premixing of oil with the alkali before the mixture reaches the heater and this ʻis apparent from the quotation from the specification above noted. We must then define the term 'intimately' as associated with mixing. What is the difference between *mixing* and *intimately mixing* and is the mixture of the oil and alkali in the Clayton disclosure intimately mixed? This raises a question of degree of mixing. How can a definite line be drawn between substances intimately mixed and premixed? We find no satisfactory reason for holding the oil and alkali mixed in the Clayton pipe connections may not be described as· intimately mixed. If appellant intended to cover mixing in an agitator to produce a smooth emulsion, we believe other language would be more appropriate. We realize that James provided a special ·agitator for closely mixing and associating the oil with the alkali and probably by this operation the process is improved, ·but we do not understand there is any unexpected result from this intimate mixing. We have not overlooked the fact that Clayton describes a fine division of alkali and diffusion of the alkaline solution within the oil in the heater coils, but this is after ʻthe oil and alkali have been thrown together and mixed before passing ·to the heater. ·and is evidently a further mixing action. Clayton also emphasizes the importance of control of heat not greater than 100° ·F. which has an effect in the next step of centrifuging as the product is said to be "foots showing practically no free oil" and more

easily divided into constituent gums, resins, etc.

"It would appear in the statements of objects of invention in the specifications of both parties that they are attempting, at least, to obtain the same purification of vegetable and animal oils and especially cottonseed oil. We feel constrained, therefore, to hold the Clayton et al application supports the counts of the interference." (Italics ours, except the words "mixing" and "intimately mixing.")

—and, accordingly, affirmed the decision of the Examiner of Interferences awarding priority of invention to appellees.

Exhibits 12 and 14 summarize appellant's weekly reports, beginning April, 1930, and ending July 26, 1930, of the experimental tests made by him in an effort to reduce the invention to practice. In his report for the week ending July 26, 1930, appellant stated:

"Centrifugal Refining of Cottonseed Oil

"The laboratory refinings on the samples of oil made to correct for the increase in ·free fatty acid show extremely high losses, although the colors are good.

"Two final runs thru the small scale apparatus with tri-sodium phosphate show very greatly improved losses, but dark colors. We are, therefore, definitely abandoning tri-sodium phosphate for cottonseed oil, but shall continue to use it with other oils. * * *

"We planned during the coming week to make larger runs to check losses on the two samples of cottonseed oil, and we have also, ordered a sample of Cochin cocoanut oil for tri-sodium phosphate refining.

"We shall also investigate mixtures ·of tri-sodium phosphate and sodium hydroxide as refining agents, and .expect to try out sodium phenolate as a demulsifying agent."

There is nothing in any of those weekly reports to indicate that appellant had successfully reduced the invention to practice. On the contrary, they definitely establish that, as late as July 26, 1930, he had not done so.

In his Exhibit 17, a report for the week ending August 9, 1930, appellant stated:

Centrifugal Refining of Cottonseed Oil

"*Work* on this *problem* has been *suspended* in order to clean up outstanding

work in the laboratory. It will be continued as soon as possible." (Italics ours.)

There is no evidence of record that appellant made any further attempt to reduce the invention to practice prior to his filing date.

On April 7, 1931, Mr. A. B. Cooper, an employee of the Sharples Specialty Company (appellant's assignee) wrote a "Daily Report" to his employer (Appellant's Exhibit 21) directing attention to the work being done by appellees with a "super centrifuge" manufactured by the Sharples Specialty Company. The report was concluded with the following statement: "I do not know what patents Dr. Stadt has applied for, but if he has not applied for patents covering *this application* of our machine it might be well to look into the matter. It may be that this problem has all been gone over at the factory, but if not, it seems that this application would bear looking into." (Italics ours.)

On April 24, 1931, appellant, James, wrote to Mr. J. H. Wilcox, San Francisco office, with reference to appellees' process for refining cottonseed oil (Appellant's Exhibit 23), and stated that he had read Cooper's report (Appellant's Exhibit 21), with much interest; that one of the first things he did upon his return to Philadelphia was to study "the possibility of continuous refining, separating the resulting soap stock with a Super Centrifuge"; and that:

"This work was carried out during the early part of 1930, *and was only laid aside on account of press of other business,* notably the continuous treating of lubricating oil.

"It is unfortunate that Cooper was not able to get more data. For instance, it would be extremely interesting to know the exact amount of caustic used in his test, the percentage of free fatty acid in the crude cottonseed oil, the refining loss to be expected by regular commercial method, also the color produced under these conditions, and finally the refining loss and color produced by the continuous method." (Italics ours.)

Appellant thereupon explained the method employed in his experimental work as follows:

"Crude cottonseed oil and caustic were fed at a definite rate into a small mixer in which they were thoroly mixed, the time of such mixing being controlled. From the mixer they passed into a heater formed of a copper coil surrounded by a glycerine bath maintained at temperature slightly above the boiling point of water. In this coil the emulsion formed by mixing the caustic and the oil was heated to approximately 70° C. and the emulsion partially broken. From the heater the broken emulsion passed to a laboratory Super Centrifuge, equipped with a special adjustable bowl, in which separation took place into clear oil and soap stock."

—and, with reference to the results he had obtained in reducing the invention to practice, said:

"I found that I was able to get soap stock which was readily discharged when I used caustic soda strength of 4, 6, and 8° Baume, (from 2 to 4% Na OH content). I used these extremely weak caustic solutions in order to minimize saponification of neutral oil as much as possible, *but unfortunately the volume handled was very large.*

"My principal difficulty was the fact that with the dilute caustic I obtained such a large volume of soap stock that although the neutral oil content in per cent was low, *actually the refining loss was high.* * * *

"Another troublesome point was · the building up of an emulsion between the soap stock and the oil in the bowl, and in view of the fact that the adjustments obtainable with the No. 1, machine are not nearly so fine as those possible with the No. 6 machine, *I was unable to obviate this difficulty.*

"The colors which I obtained were excellent, and quite equal to those produced by refining the oil by the standard method.

"So far as patent protection is concerned, continuous refining is covered by U. S. Patent No. 1,457,072 issued to the DeLaval Company on the 29th of May, 1923. This patent is of doubtful value and I believe could be readily gotten around, but [confidential] would probably effectively prevent our obtaining good patent protection on the process. I shall be extremely interested in hearing of any further results which Cooper may get, and shall be glad to assist you in evaluating the process by every means in my power.

"I strongly urge that the following points be covered in future reports if the information can be obtained.

"First—free fatty acid of crude treated,

"Second—strength and percentage of caustic used,

"Third—Color and refining loss obtained when the oil is refined by standard method,

"Fourth—Color and refining loss obtained when the *oil is refined in the continuous apparatus and the soap stock separated with a Super Centrifuge,*

"Fifth—Neutral oil content of the soap stock discharged from the centrifugal." (Italics ours.)

It is argued by counsel for appellant that Exhibit 23 fully discloses the *invention in issue, and that it was shown to* Clayton and to Stadt, two of the appellees.

Clayton denied having seen or read the contents of the exhibit, and stated that, had he known that appellant was working on a process for "Centrifugal Refining of Cottonseed Oil," he would have had nothing further to do with him or his assignee, the Sharples Specialty Company.

Dr. Stadt stated that the only part of the exhibit he recalled having seen was the last portion of it where appellant requested information concerning the five points in which he was particularly interested.

Assuming, for the purpose of this decision, that appellant did disclose the invention in that exhibit, it, nevertheless, clearly appears from appellant's statements contained therein that, as late as April 24, 1931, he had failed to reduce the invention to practice. Furthermore, on May 20, 1931, eighteen days after appellees had filed their application, Mr. J. H. Wilcox addressed a letter to Mr. P. T. Sharples, Philadelphia (Appellant's Exhibit 22), wherein it was stated that the Sharples Specialty Company had recently sold a No. 6 super centrifuge to appellees. Mr. Wilcox gave a rather detailed description of appellees' process, and inclosed a sketch, which the Examiner of Interferences held disclosed the involved invention. Appellant admitted that he had seen the sketch and the letter about the time they were received by Mr. Sharples.

As hereinbefore noted, there is no evidence of record to establish that appellant made any attempt to reduce the invention to practice subsequent to August 9, 1930, and prior to the filing of his application, October 6, 1931.

We are in agreement with the concurring decisions of the Patent Office tribunals that appellant was not diligent from immediately prior to appellees' filing date, May 2, 1931, and thereafter, until he filed his application, October 6, 1931.

We come now to the only remaining issue in the case, that is, the right of appellees to make the counts in issue.

Each of the tribunals below decided that issue in favor of appellees.

Although other matters have been discussed by counsel, the only question of importance involved in that issue is whether "intimately mixing" the oil and alkali, as stated in count 1, or effecting a "thorough admixture thereof," as stated in count 3, is disclosed in appellees' application by the language "premixing the oil and caustic" before heating. In other words, the question is whether the premixing of the oil and alkali before heating, as stated in appellees' application, is a sufficient disclosure of the language of the claims— "intimately mixing" and a "thorough admixture thereof" before heating.

As stated in the decision of the Board of Appeals, appellees submitted evidence by experts, who performed "inter parte tests" in the presence of appellant's representatives, and who testified that intimate mixtures of oil and alkali were produced by appellees' process.

In appellees' specification it is stated, as hereinbefore noted, that: "It is obvious, however, if the alkali is introduced closer to the oil supply A, *which may be remote from* the heater 3, premixing with the oil will take place in the pipe A' before reaching the heater 3 and step two." (Italics ours.)

Referring to premixing and intimately mixing, the board stated: "This raises a question of degree of mixing. How can a definite line be drawn between substances intimately mixed and premixed? We find no satisfactory reason for holding the oil and alkali mixed in the Clayton pipe connections may not be described as intimately mixed. If appellant intended to cover mixing in an agitator to produce a smooth emulsion, we believe other language would be more appropriate."

It is well established that counts in an interference must be given as broad a construction as their language will reasonably permit. However, if the language

of the counts is ambiguous, it must be read in the light of the specification in which the counts originated.

The word "mix" is defined by the lexicographers as follows:

"1. To cause a promiscuous interpenetration of the parts of, as of two or more substances with each other, or of one substance with others; to unite or blend into one mass or compound, as by stirring together; hence, to combine (any material or immaterial things); to mingle; blend; as to *mix* flour and salt; to *mix* wines; * * *

"4. To form by mingling; to produce or prepare by the stirring together of ingredients; to compound." Webster's New International Dictionary.

"I. *t.* 1. To cause to unite promiscuously into one mass, assemblage, or body; incorporate closely and indiscriminately together; mingle so as to render separately indistinguishable; as, to *mix* breeds of animals; to *mix* water with whisky. * * * 3. To produce by incorporating different ingredients; make by mingling; as, to *mix* dough. * * *

"II. *i.* 1. To become promiscuously united or blended; become incorporated together into one body; as gases *mix;* * * *" Funk & Wagnalls New Standard Dictionary.

The word "blend" means "to unite intimately." See Webster's New International Dictionary.

It will be observed that the word "mix" means a "promiscuous interpenetration" of two or more substances with each other; "to unite or blend [them] into one mass or compound." It is clear, therefore, that the term "intimately mixing" is, to say the least, included within the dictionary definitions of the term "mix."

The word "admixture" means the "act of mixing, or the compound formed by mixing, different substances together; mixture." See Webster's New International Dictionary.

Accordingly, there is no distinction in meaning between the terms "intimately mixing" and "a thorough admixture," as called for in the appealed counts, and "premixing," as used in appellees' specification.

Counsel for appellant argue that the term "intimately mixing" should be narrowly interpreted.

In view of the fact that that term is not ambiguous, we have no authority to give it other than its broad meaning. See Swain v. Booth, 54 App.D.C. 95, 295 F. 236; Hagen v. Cords, 88 F.(2d) 998, 1000, 24 C.C.P.A. (Patents) ——.

We agree with the statement of the Board of Appeals that: "If appellant intended to cover mixing in an agitator to produce a smooth emulsion, we believe other language would be more appropriate." However, the counts in issue are not so limited, and we cannot read such a limitation into them.

For the reasons stated, we are of opinion that appellees are entitled to make the claims constituting the counts in issue. Accordingly, the decision of the Board of Appeals is affirmed.

Affirmed.

LENROOT, Associate Judge, concurs in conclusion.